**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **BARRY C. HONIG, GRQ CONSULTANTS, INC., and RENEE HONIG FAMILY FOUNDATION, INC.**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ANSON FUNDS MANAGEMENT, LP; ANSON ADVISORS, INC.; CITRON CAPITAL, LLC; CITRON CAPITAL LP; RYAN CHOI; MOEZ KASSAM; SUNNY PURI; and DOES 1-10,**<br><br>**Defendants.** | **Case No. _____** |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Barry C. Honig ("Honig"), The Renee Honig Family Foundation, Inc. and GRQ Consultants, Inc., (collectively, "Plaintiffs") by and through their attorneys, hereby file this Complaint against Defendants Anson Funds Management LP, Anson Advisors, Inc., Citron Capital, LLC, Citron Capital LP, Ryan Choi, Moez Kassam, Sunny Puri, and Does 1-10, and allege as follows:

### INTRODUCTION

1.      Defendants are members of a shadowy gang of short sellers who conspired to perpetrate a "short-and-distort" scheme of breathtaking scope, involving the securities of more than a dozen different public companies over a five-year span, which devastated the markets for securities of the targeted companies.

2.      The participants in the scheme short sold securities in each targeted company, and then after their short positions were established, coordinated with a third-party, public-facing front

man who published false negative news about the targets via online social media and traditional news media, appearances on cable news programs, interviews, and mainstream news articles. The negative news coordinated via each attack was designed to cause the market price of each target company's securities to rapidly decline, at which point the conspirators covered their short positions. The scheme generated millions of dollars in illicit profits for its perpetrators, while inflicting *billions* of dollars in losses upon the targeted companies and those companies' innocent shareholders.

3.      One of the Defendants' targets was a formerly-public company named PolarityTE, a biotechnology company that developed a revolutionary regenerative tissue engineering technology for use in wound care and surgical reconstruction. PolarityTE was subjected to two attacks by the Defendants over a span of four months. Defendants selected PolarityTE as a target, established short positions in PolarityTE's securities, then had their front-man saturate the media with knowingly false 'reports' which called the company a "FRAUD" (in all capitals), falsely stated that the company had its patent application rejected and hid the news, and accused company management of criminal conduct. These were calculated lies designed to crush the company's stock price and enrich Defendants at the expense of PolarityTE's shareholders, including Plaintiffs.

4.      Unfortunately, the attacks worked. The disparaging allegations sent PolarityTE's stock price, and the company itself, into a downward spiral. Its stock price immediately declined over 40% and ultimately plummeted to zero. The company was hit with a securities class action lawsuit. The false narrative about PolarityTE's patents was demonstrably false as demonstrated by the USPTO allowing its patent, and the class action lawsuit ultimately was dismissed. Still, the damage was done; following the negative media reports, PolarityTE lost its institutional financing,

eventually was forced to seek bankruptcy protection, and its shareholders, including Plaintiffs, suffered massive losses.

5.      At the time of the attacks, Plaintiffs were, collectively, the second largest shareholders of PolarityTE. As a direct result of the attacks, they suffered millions of dollars of loss in the value of their holdings. By this lawsuit, Plaintiffs seek to recover the damages they suffered as a result of the Defendants' misconduct.

6.      Beginning in July 2024, Defendants' scheme was exposed to the public. The United States Attorney for the Central District of California secured  a grand jury indictment against the public-facing puppet of the gang, Andrew Left, for his role in the scheme, charging him with criminal manipulation of the price of securities of the targeted companies. Around the same time, the Enforcement Division of the Securities Exchange Commission ("SEC") announced a series of settled enforcement actions against the puppet-masters who directed the scheme from behind the scenes.

7.      While the targets of the SEC enforcement actions paid millions of dollars in fines and disgorgement, those payments amounted to mere "slaps on the wrist"—the federal government gave them leniency in exchange for their ongoing cooperation in the prosecution of Left. And the wrongdoers' payments did not help the innocent shareholders victimized by the scheme. This action is intended to bring the behind-the-scenes bad actors out of the shadows, into the light, and make them pay a portion of the damages they caused to innocent shareholders.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and more than $75,000 is at issue, exclusive of interest, costs, and fees.

9.      Venue is proper in the Northern District of Texas, Dallas Division under 28 U.S.C. § 1391(b)(2) because it is the district in which all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

10.      Personal jurisdiction over Defendants exists because Defendants regularly engaged in business and transacted business in Texas. Specifically, Anson Funds is organized and headquartered in Texas, and Anson Advisors and Anson Funds are co-investment advisers of a number of private pooled investment vehicles, including flagship fund Anson Investments Master Fund LP, which participated in the transactions described herein. Anson Advisors and Anson Funds share common management, including defendant Kassam, who is a director of both entities. Anson Advisors and Anson Funds performed contracts in whole or in part in Texas and recruited Texas residents for employment inside and outside of Texas.

11.      Personal jurisdiction exists over Defendants Citron Capital, LLC, Citron Capital, LP, Choi, and Does 1-10, because they reached agreements with Anson and/or performed those agreements, in whole or in part, in Texas and/or conspired with and/or worked at the direction of Defendants Anson, Kassam, and Puri to commit torts in part or in whole in Texas. Specifically, on information and belief, Anson—acting from Texas—directed Defendants Citron Capital, LLC, Citron Capital, LP, Choi, and Does 1-10 to engage in unlawful and harmful acts described herein, and Defendants collectively conspired to engage in such unlawful purposes in the State of Texas.

## PARTIES

12.      Plaintiff Barry C. Honig ("**Honig**") is an individual who is a resident of Palm Beach County, Florida and was a Florida resident during all relevant times.

13.      Plaintiff GRQ Consultants, Inc. ("**GRQ**") is a Florida corporation with its principal place of business in Palm Beach County, Florida. GRQ is owned and was operated by Honig at all

relevant times. GRQ is the plan administrator for GRQ Consultants, Inc. Roth 401k FBO Barry Honig, GRQ Consultants, Inc. Roth 401k FBO Renee Honig, and GRQ Consultants, Inc. 401k., all of which owned shares of PolarityTE stock during the relevant period and were damaged by Defendants' conduct as alleged herein.

14.    Plaintiff The Renee Honig Family Foundation, Inc., ("**Honig Foundation**") is a Florida not for profit corporation based in Boca Raton, Florida. Honig, GRQ and Honig Foundation are referred to herein, collectively, as "**Plaintiffs**."

15.    Defendant Anson Funds Management, LP ("**Anson Funds**") is a limited partnership organized under the laws of Texas with a principal place of business in Dallas, Texas. Anson Funds was founded in 2003. It has been registered as an investment adviser with the SEC since 2012. As of December 31, 2025, Anson reported having approximately $2.9 billion in regulatory assets under management.

16.    Defendant Anson Advisors, Inc. ("**Anson Advisors**") is a corporation organized under the laws of Ontario, with a principal place of business in Toronto, Canada. Anson Advisors was founded in 2007. Anson Advisors is registered with the Ontario Securities Commission and has reported to the Commission as an exempt reporting adviser since 2013.

17.    Anson Funds and Anson Advisors (collectively, "**Anson**") are co-investment advisers of a number of private pooled investment vehicles that invest in United States based companies. Anson was the subject of a cease-and-desist and administrative proceeding with the SEC related to its dealings with Defendants Choi and Citron. *In the Matter of Anson Advisors Inc. and Anson Funds Management LP, Inv. Adv*. Act Rel. No. 6622 (June 11, 2024). To settle the charges brought against them, the two entities agreed to a cease-and-desist order and a censure,

Anson Advisors agreed to pay civil money penalties of $1,000,000, and Anson Funds agreed to pay civil money penalties of $1,250,000.

18.    Defendant Moez Kassam ("**Kassam**") is the Co-Founder, Chairman and Chief Investment Officer of Anson, and on information and belief, resides in Toronto, Ontario, Canada. On information and belief, Kassam is cooperating with the US Department of Justice in connection with its current prosecution of Left. On information and belief, Kassam was the mastermind of the short attack on PolarityTE and conspired with the other Defendants named herein to publish false negative information about PolarityTE for the purpose of driving down the market price of PolarityTE securities.

19.    Defendant Sunny Puri ("**Puri**") is Co-Head of Investments at Anson, and on information and belief, resides in Toronto, Ontario, Canada. On information and belief, Puri is cooperating with the US Department of Justice in connection with its current prosecution of Left.

20.    Defendant Citron Capital, LLC ("**Citron Capital**") is a California corporation established under the name "Choi Capital LLC" in 2017 by defendant Choi. Its name was changed to Citron Capital LLC on or about October 3, 2018.  Citron Capital registered with the SEC as an investment adviser between October 2018 and April 2019, and thereafter was an exempt reporting adviser registered with the California Department of Business Oversight until March 2022. Citron was incorporated and had its principal place of business in California. Citron Capital managed an investment fund, Citron Capital LP. Citron Capital has been charged in an SEC enforcement action captioned *SEC v. Left, et al.*, 2:24-cv-06311 (C.D. Cal. July 26, 2024) arising from the conduct alleged herein.

21.    Defendant Citron Capital LP ("**Citron LP**") is a Delaware corporation that was founded by Defendant Choi on or about October 3, 2018, at or about the same time that Citron

Capital's name was changed from "Choi Capital LLC." On information and belief, Citron LP was an investment fund managed by Citron Capital, which bought and sold securities of the targeted companies as described herein.

22.     Defendant Ryan Choi ("**Choi**") is a short seller who resides in Beverly Hills, California, and was a resident there at all times relevant to this Complaint. Choi held Series 63, 65 and 79 licenses and was registered with the State of California as an investment adviser representative from 2017 to 2018. Choi was sued by the SEC in a civil enforcement action in connection with the scheme alleged herein and agreed to pay more than $1.8 million to settle the charges brought against him. On information and belief, Choi is cooperating with the US Department of Justice in connection with its current prosecution of Left.

23.     The true names and capacities of the defendants named herein as Does 1 through 10, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs, which therefore sues those defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of the defendants designated as a "Doe" defendant participated in the securities manipulation scheme alleged herein, and is legally responsible for the events hereinafter alleged and legally caused injury and damages proximately thereby to Plaintiffs as herein alleged. Plaintiffs will amend this petition when the true names and capacities of the "Doe" defendants have been ascertained. The previously identified defendants, together with the "Doe" defendants, are hereinafter collectively referred to as the "**Defendants.**"

<u>**RELEVANT NON-PARTIES**</u>

24.     Andrew Left ("**Left**") is a short seller who, on information and belief, resides in Boca Raton, Florida. He was a resident of Beverly Hills, California at all times relevant to this

Complaint. Left was indicted by the United States for his role in the scheme alleged in this Complaint and is facing a trial currently scheduled to commence in Spring 2026.

25.    Nathan Anderson is a short seller who, on information and belief, resides in the New York City area. During the relevant period, Anderson publicly disseminated published commentaries regarding certain targeted companies that were written in whole or in part by certain of the Defendants.

## TERMS USED IN THIS COMPLAINT

26.    An investor typically takes a "short" position when he or she anticipates that the price of a security will decrease. A "short sale" by an investor is the sale of a security that the seller does not own or any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller. In order to deliver the security to the purchaser, the short seller will borrow the security, typically from a broker-dealer or an institutional investor. The investor can subsequently "cover" or "exit" his or her short position by purchasing the security and returning it to the lender. If the price decreases, the investor may profit by covering (purchasing the security) for less than the short sale price. If, on the other hand, the price increases, the investor may take a loss.

27.    A "tweet" is a short status update on the social networking site formerly known as Twitter (officially known as X since 2023) which can include images, videos, GIFs, straw polls, hashtags, mentions, and hyperlinks. Following the acquisition of Twitter in October 2022, and rebranding of the site as "X" in July 2023, all references to the word "tweet" were removed from the service and updates were officially renamed "posts"; however, messages on X often still are colloquially called "tweets."

**FACTUAL ALLEGATIONS**

**I.  Defendants' Scheme to Manipulate the Market of Dozens of Public Companies**

**A.  Kassam, Anson, and Puri Are Prolific Short Sellers**

28.     In 2007, Defendant Kassam founded an investment management firm that ultimately came to be named Anson Advisors. Since that time, he also established Anson Funds; equity funds that are managed by Anson Advisors.

29.     Defendant Puri joined Anson in 2013. His current title is "Co-Head of Investments." At all relevant times, Puri was deeply involved in all aspects of Anson Funds' investment process.

30.     Short selling securities is one of Anson's principal investment strategies.

31.     Anson, Kassam and Puri have a long history of engaging in schemes that have resulted in civil and regulatory action. Citing just a few examples:

a.      In 2015, Nobilis, a Canadian corporation that owns and manages medical buildings brought suit against Anson and other funds for their "unlawful short attack scheme" that involved broadcasting false and defamatory information about Nobilis in order to drive down the price of its public shares. The attack by Anson caused Nobilis's stock price to fall by nearly 60%, an extraordinary decline that Nobilis alleges Anson immediately capitalized on to achieve large profits.

b.      In 2017, the Catalyst Capital Group Inc. ("Catalyst") and Callidus Capital Corporation ("Callidus"), brought an action against Anson seeking to hold it accountable for a scheme in which Anson spread false and defamatory information about Callidus and Catalyst, causing a chaotic sell-off that enabled Anson and its co-conspirators to purchase reduced-price shares to cover their naked short positions.

c.      In 2021, the SEC fined Anson Advisors for violating Rule 105 of Regulation M under the Securities Exchange Act of 1934, which prohibits short selling of an equity during a restricted period and then subsequent buying the same security in the public offer during the restricted period. Anson violated that Rule in connection

with three separate offerings. Anson was assessed over $3 million in disgorgement, penalties, and interest.

d.   In January 2022, Todd Augenbaum, a shareholder of Genius Brands International, Inc. ("Genius Brands"), filed an action alleging that Anson engaged in illegal short-swing trades of Genius Brands. Anson and its co-conspirators acquired more than 10% of Genius Brands' shares and then engaged in a media campaign to manipulate Genius Brands' stock price for trading advantage and unlawful profits alleged to exceed $100 million.

e.   In 2023, Nano Dimension Ltd., a supplier of 3D printers, filed suit against Anson and certain of its affiliates, alleging that they conspired with each other to attempt to obtain a large stake in the company surreptitiously by failing to file required SEC disclosures.

f.   And as noted herein, Anson was also sued by the SEC in connection with the scheme alleged herein.

32.   Anson, Kassam and Puri typically did not publicly disseminate research or articles under their own names about companies in which they engaged in securities trading. They did not publish their own short reports.

33.   Instead, in order to conceal their involvement, Anson frequently coordinated its investing activities with activist short publishers who released reports presenting bearish information about target companies. These short reports typically were posted on independent social media sites operated by the short publishers.

34.   Kassam was the ringleader of the scheme. Through his company, Anson, he entered into both formal and informal agreements with short publishers to, depending upon the particular campaign, (a) target public companies selected by Kassam or Puri for a short sale campaign, and/or (b) pay other short report publishers to publish information about target companies that was drafted in whole or in part by Anson. At other times, Anson paid short publishers to tip off Anson about imminent short campaigns, so that Kassam or Puri could establish short positions held by Anson

Plaintiffs' Original Complaint

Funds, and profit by covering those short positions after negative reports about targeted companies were published.

35.     On information and belief, as compensation, Kassam agreed to have Anson pay the short publisher a percentage of Anson Funds' profits from trading following publication of negative information about target companies. In other instances, Anson paid short publishers to tip off Anson in advance about planned short attacks, so that Anson could establish short positions in advance of the attacks and profit by covering its short positions after an attack had crushed the stock price of a target.

36.     The activist short publishers with whom Anson, Kassam and Puri worked included defendants Choi and Citron, non-parties Left and Anderson, and on information and belief, other publishers the identities of which Plaintiffs hope to confirm though discovery.

**B.   Left Establishes Citron Research**

37.     Andrew Left began publishing reports recommending investment ideas to the market in the early 2000s through a website he created, originally named StockLemon.com. Left rebranded his platform under the name 'Citron Research' in 2008.

38.     Citron Research primarily was a "short" publisher that disseminated negative or disparaging information on target companies. The Citron Research short publications often strongly encouraged readers to sell the stock of the target company.

39.     Citron Research's recommendations typically were drafted in a sensationalist exposé style and strongly encouraged readers to sell the stock of the target company. These publications would often declare a company a "fraud," "scam," or "scheme," and use powerful imagery and language, such as calling a company "the Harvey Weinstein of social media,"

"uninvestable," declaring that "investors have been warned," "wait until Senate finds out what Citron has published," and warning that the "SEC should immediately HALT this stock."

C.    **Choi and Left Establish Citron Capital**

40.    In 2018, Choi began working for Left. He assisted Left in the drafting of Citron Research publications which presented investment views and information on target companies. Choi often reviewed the Citron Research publications prior to their release.

41.    Before he started working with Left, in March 2017, Choi established a California Limited Liability Company originally named "Choi Capital, LLC."

42.    In October 2018, at the direction of Left, Choi filed an amendment to Choi Capital's Articles of Organization, changing the name of the entity to "Citron Capital, LLC."

43.    On information and belief, Citron Capital was established as a front, to advance the false pretense that Choi and Left successfully managed a hedge fund using third-party investors' funds. In reality, however, Citron Capital never had any outside investors and was funded solely with Left's own money.

44.    Choi handled day-to-day business tasks of Citron Capital, including the formation of the entity and its policies and procedures. Left directed the trading and investment decisions, and Choi entered the trades in the Citron Capital account.

D.    **Left Could Move Markets With Just a Tweet; Anson Knew This**

45.    During the Relevant Period, Left disseminated stock recommendations through multiple channels, including reports posted on his website (CitronResearch.com), email blasts to subscribers, and via the Twitter platform using Citron's twitter feed, @CitronResearch.

46.    Left had more than one hundred thousand followers on Twitter. Left often published recommendations on particular companies, without publishing a lengthy report, simply

by posting tweets on Twitter about them. His tweets often were picked up by other media outlets and quickly repeated to a much wider audience.

47.     Left also frequently appeared on media broadcasts such as CNBC where he would discuss the recommendations he had published through Citron Research.

48.     Many of the recommendations published by Citron Research were "short recommendations," where Citron Research induced investors to sell their shares in the target company. The publications making these recommendations often represented to the market that Citron also had short exposure or was "short" in the target stock.

49.     Because of their wide dissemination, investors often sold their stock in response to Citron Research's short recommendations. This typically led to a rapid decline in the stock price of a company targeted by a Citron short recommendation.

50.     All of the Defendants knew that investors often bought or sold stock in response to Citron Research's recommendations, and that its investment recommendations impacted the market. Kassam was a business associate of Left for many years who knew of the ability of a Citron report or tweet to rapidly move the market price of a targeted company's securities.

51.     For example, in or around March 2018, Left bragged to colleagues that he was confident he could "destroy" or "kill" companies by publishing a tweet or report, and told a colleague in August 2018 that he had a "hot voice" that he planned to "take a vantage [sic] of." Similarly, in May 2018, Left repeated a quote from a Business Insider article: that he could "send a stock tumbling with a single tweet."

52.     The Citron publications often included a target price, leading readers to believe that this was the price at which Citron thought the stock would trade. The Citron Research recommendations contained little to no analysis of how the price target had been determined.

-13-

53.     The target prices were typically far below the stock's current trading price, giving the market the impression that the stock prices of the target companies would drastically decrease in the direction of the Citron Research recommendation.

54.     Unbeknownst to investors, Citron planned to quickly abandon its stated exposure in order to capitalize on the stock price moves following the release of its reports and tweets, and planned to do so at far different prices than the price targets that its publications made to the market. This practice deceived investors into believing that Citron's reports were truthful, independent stock recommendations, when in fact they contained false statements or misleading half-truths intended to create a catalyst to move the target company's stock price so that Citron could quickly close its position and profit.

55.     Citron presented itself as an "independent" research firm. In August 2019, Left claimed that "in 18 years of publishing, we have never been compensated by a third party to publish research." This was a lie.

E.  **The Scheme Commences**

56.     Beginning in or about March 2018, and continuing through at least in or about October 2023, Defendants agreed to participate in a scheme to target public companies with coordinated attacks to drive down the market price of those companies' securities, so that the Defendants could profit by short selling securities of those companies prior to the attacks.

57.     Knowing that Citron's reputation with investors had the power to move markets, Defendants selected target companies about which Citron would publish a negative report with the intention of driving downward the market price of the target companies' securities.

58.     Defendants concealed that they prepared publications about the targeted companies for dissemination through Citron Research and other media channels.

59.     From 2018 through 2023, Left, Choi and Citron targeted over a dozen companies for such short sale attacks; Anson, Kassam and Puri were secretly behind many of those attacks.

60.     In connection with some of those attacks, Plaintiffs are informed that Anson drafted wording and sent it to Citron to be used in Citron publications about targeted companies. In other instances, Anson paid Citron to tip off Anson in advance about planned short attacks by Citron, so that Anson could establish short positions in advance of the attacks and profit by covering its short positions after the Citron short attack had driven down the stock price of the target.

61.     Prior to publication of Citron's commentary, Defendants established short positions in a targeted company's securities so that they could profit by taking advantage of the intended decline in the securities' market price that would be caused by the forthcoming Citron Research negative recommendations.

62.     To maximize the impact of Citron Research's reports on the price of a targeted company, Defendants secretly caused those reports to be deceptive in numerous respects. For instance, to perpetuate the ruse that Citron's 'research' was 'independent,' Left and Choi concealed the fact that third parties such as Anson wrote portions of some reports.

63.     Defendants also maintained the false pretense that the content of Citron's publications was not tainted by any conflict of interest by concealing that Citron at times was paid by Anson, to either: (a) target companies selected by Kassam or Puri; (b) publish information provided by Kassam or Puri; or (c) provide advance notice of the date when an attack would commence, so that Kassam or Puri could establish short positions for Anson and profit by trading around the Citron Reports' publications.

64.     Defendants concealed their intentions to transact in the securities of a targeted company in a manner inconsistent with the content and conclusions of Citron's commentary, by

covering all or the majority of the positions they held in the targeted company's securities shortly after the Citron commentary on the targeted company was published.

65.     Neither Anson, Kassam, nor Puri ever publicly disclosed that they were working with and paying Citron (and other short report publishers such as Nate Anderson), to obtain advance knowledge of short attacks, and at times directing those attacks.

66.     Kassam and Puri, through Anson, agreed to pay, and did in fact pay, Left and/or Citron when Anson profited from such attacks. To conceal Anson's behind-the-scenes participation in Citron's short attacks, Anson arranged for its payments to be funneled through a third-party called Falcon Research ("Falcon"), and its president Kurt Feshbach.

67.     To facilitate the hidden payments, Falcon's Kurt Feshbach provided Anson with invoices totaling hundreds of thousands of dollars each, labeled as invoices for "Research Services" for various companies not subject to the short campaigns.

68.     Anson paid those invoices to Falcon, and then in turn, upon receipt of payment of the false invoices by Anson, Feshbach forwarded those payments to Left via wire transfers to a Citibank account controlled by Left.

69.     Anson's trading around the short campaigns that it coordinated with Citron generated millions of dollars in profits for Anson; in turn, Anson paid Left/Citron millions of dollars to participate in the scheme.

**II. Defendants' Coordinated Attacks on PolarityTE Caused Millions of Dollars of Damages to Plaintiffs.**

    **A. <u>About PolarityTE</u>**

70.    One of the companies targeted by Defendants was PolarityTE, a biotechnology and regenerative biomaterials company founded by Dr. Denver Lough and Edward Swanson that designed and developed regenerative skin tissue products.

71.    PolarityTE's leading product, designed by Dr. Lough, was SkinTE, a product which was intended to repurpose a patient's own skin to heal damaged or lost skin tissue.

72.    As part of his medical practice, Lough saw many patients with significant burns and other tissue voids. These wounds are usually treated by using split-thickness skin grafting or skin substitute products which provide a "barrier" to prevent infection, but do not replicate the native skin that existed before the injury. Dr. Lough believed that he could use a patient's own tissue to fully reengineer and regenerate native skin.

73.    After developing the technology behind SkinTE, Dr. Lough filed several applications to patent this technology with the United States Patent and Trademark Office ("USPTO") between December 2014 and July 2017, including a provisional patent application with the USPTO documenting his invention, and later filed a non-provisional patent application claiming priority to the provisional application.

74.    The patent application process can be lengthy and technical, and that was the case for PolarityTE's process of obtaining a patent for SkinTE.

75.    At certain times during the process, the USPTO issued letters to PolarityTE, and posted various status updates on the USPTO website. In March 2017, for instance, the USPTO

issued what is called a "Non-Final Rejection" of the patent application; later, in 2018, the USPTO issued what is colloquially called a "Final Rejection" of application.

76.    However, the word "final" as used in the patent application process is a term of art, and an unfortunate misnomer. In the patent world, "final" does not really mean "final" or "the end," but rather just denotes a milestone in the application process.

77.    Receiving a "final" rejection does not mean that a patent application has been completely and forever rejected by the USPTO and cannot be saved; quite the contrary. After receiving a "final" office action, the patent process continues. A "final" rejection only means that a six-month clock commences for an applicant to take one of several possible next steps on its patent application.

78.    After a so-called "final" rejection an applicant may: (1) request a continued examination of the application (an "RCE"); (2) amend and resubmit the application; or (3) provide new evidence in support of patentability. *See* 37 C.F.R. §§ 1.113, 1.114.

79.    Applicants receive patents following RCEs nearly 70% of the time—in other words, in the vast majority of instances where a "final rejection" issues but the applicant continues to pursue its claim, a patent is issued.

80.    Indeed, the USPTO itself recognizes that a "final rejection" does not in fact terminate a patent application. Courts have recognized that there is no such thing as a terminal rejection. Prosecution terminates with either an issued patent or an abandonment of the application.

81.    Polarity filed an RCE in response to the so-called "final rejection," and continued the patent process.

82.    Ultimately, in February 2021, the USPTO granted a patent for SkinTE, Patent No. US 10,92,001 B2.

B. **Defendants' Attacks on PolarityTE**

83.     Defendants, however, exploited retail investors' unfamiliarity with the terminology of the patent application process to launch an attack on PolarityTE.

84.     In June 2018, Defendants selected PolarityTE as a target for a short attack.

85.     On information and belief, Kassam and Puri established a short position for PolarityTE stock in Anson's accounts, and Choi established a short position for PolarityTE stock in Citron Capital's accounts. Plaintiffs believe that discovery will reveal other funds that Defendants tipped off about the forthcoming attack on PolarityTE, so that those funds could also establish short positions and profit from a decline in the market price of PolarityTE securities.

86.     On information and belief, Defendants published amongst each other drafts of a forthcoming report about PolarityTE, which communicated false and disparaging information about PolarityTE and Plaintiff Honig.

87.     On June 25, 2018, Defendants launched their attack on PolarityTE through a report, which concealed Defendants' involvement, published by Citron entitled ***Citron Exposes History of FRAUD Behind PolarityTE …That is right …we said it – FRAUD.*** The publication was posted on the Citronresearch.com website, and links were provided via a tweet on the Citron Twitter account.

88.     The publication recommended that investors immediately sell PolarityTE securities because the company was a "fraud." The report claimed that PolarityTE's patent application was "dead on arrival" because it had received a notice of rejection of its patent by USPTO, and that "the odds [were] in the low single digits" for the company to reverse the USPTO's decision and eventually have the patent granted.

89.     In over-the-top fashion, the report stated "[PolarityTE has] been rejected for patent status for their technology. . . . The continued omission of the only relevant fact regarding the company and its 'technology' combined with the sales of securities by insiders is not only securities fraud, but we believe constitutes criminal and not just civil fraud."

90.     Defendants covered their short positions in PolarityTE stock shortly after the attack was published, earning illicit profits.

91.     The report was materially false and misleading because it: (a) omitted to state that Anson was paying Citron to coordinate their manipulative activity; (b) omitted to state that Defendants intended to cover their short positions within hours or a few days of publication; (c) falsely suggested that the notice from USPTO signaled a likely end of PolarityTE's patent application process; (d) falsely suggested that the USPTO notice – which was publicly available on the USPTO website – was 'hidden' by PolarityTE; (e) falsely alleged "sales of securities by insiders" – there were no insider sales.

92.     As a result of the attack, the market value of PolarityTE stock crashed by over 33% in one day, and nearly 50% within a week, wiping out hundreds of millions of dollars of shareholder value.

93.     Approximately four months later, Defendants launched a second attack. On information and belief, Anson, Kassam and Puri contributed to, or were advised ahead of time about, a forthcoming negative report about PolarityTE to be published by Citron. As before, Defendants established short position for PolarityTE stock in their respective investment accounts, in advance of publication of another negative and false report about PolarityTE.

94.     On October 18, 2018, Citron published a 'report' on the Citron website entitled *"PolarityTE: This Game Is Over! Price Target -$2."*

95.     Citron provided a link to the article on its Twitter account, teasing that the report "might (be) our shortest but most damaging report to date."

96.     The report regurgitated the false allegation that PolarityTE's patent application was dead. It was not.

97.     The report also misrepresented the significance of a letter that PolarityTE had received from the Food and Drug Administration ("FDA") following its perfunctory inspection of a new PolarityTE manufacturing facility.

98.     As is standard practice, following the inspection the FDA sent PolarityTE a list of "inspectional observations" which in the investigators' judgment may potentially constitute violations of FDA standards. The FDA letter was on a standard form that expressly stated that it does "not represent a final Agency determination regarding [the company's] compliance" with FDA regulations, and gave the company the opportunity to respond and correct the observations, which PolarityTE did—the observations were quickly addressed, and the FDA took no further regulatory action.

99.     While the letter was a commonplace event, and no need for concern, the Citron report portrayed the letter as a fatal stroke to the company. The report falsely blared, "PolarityTE has always had the signs of a stock scheme *but now the FDA has proven it*" (emphasis added). This was completely false; the FDA did not investigate whether PolarityTE was engaged in a "stock scheme," addressed nothing of the sort in its letter, and had "proven" nothing.

100.    Defendants covered their short positions in PolarityTE stock shortly after the attack was published, earning illicit profits.

101.    The Citron report was materially false and misleading because it: (a) omitted to state that Anson was paying Citron to coordinate their manipulative activity; (b) omitted to state

that Defendants intended to cover their short positions within hours or a few days of publication; (c) falsely suggested that PolarityTE's patent application had failed; (d) falsely suggested that notices regarding the status of the patent application were 'hidden' by PolarityTE; and, (e) falsely stated that the FDA had "proven" that PolarityTE was a "stock scheme."

102.    The price of PolarityTE's stock dropped another 17.05%, immediately following this second attack.

103.    Even worse, however, was that the disparaging statements made about PolarityTE's product scared away the institutional investors who had funded the company up to that point, who sold their holdings. Subsequently, PolarityTE had great difficulty raising any capital, and was only able to raise small amounts pursuant to 'toxic' terms that further stressed the company's balance sheet. Despite its promising technology, the overhang from the short attacks on PolarityTE's ability to raise funding eventually forced the company to declare bankruptcy in June 2023, driving the market value of its shares to $0.

### C. **Plaintiffs' Damages**

104.    Prior to the short attacks on PolarityTE, Plaintiffs were, collectively, its second largest shareholders, owning just under 10% of the company.

105.    The securities held by Plaintiffs included preferred convertible shares. These securities were convertible into shares of PolarityTE common stock based on a conversion formula set forth in contracts between PolarityTE and the holders of the securities. The existence of these classes of securities, and the contracts underlying them, were publicly known through PolarityTE's filing of dozens of public disclosures with the SEC. Defendants knew or should have known of the existence of these classes of securities, and the contracts underlying them.

106.   As of the day when Defendants initiated their attack, Plaintiffs owned over 1.6 million PolarityTE shares.

107.    Prior to PolarityTE's bankruptcy filing, Plaintiffs were able to sell some of their shares at very depressed prices affected by Defendants' scheme. Plaintiffs were unable to sell the remainder of their shares prior to PolarityTE's bankruptcy. Plaintiffs' damages are in an amount that exceeds the jurisdictional minimum for this court.

### III. Federal Law Enforcement Exposes and Shuts Down The Scheme

108.   Defendants' scheme was revealed by a series of government lawsuits against the Defendants, and an indictment against Left, which were announced in mid-to-late 2024.

109.   On July 25, 2024, a grand jury indictment issued charging Left with one count of engaging in a securities fraud scheme, 17 counts of securities fraud, and one count of making false statements to federal investigators for what the government described was "a long-running market manipulation scheme."

110.   The indictment detailed how Left, in cooperation with several un-indicted and anonymously-labeled conspirators, manipulated the market prices of 21 issuers, over the period 2018-2023.

111.   The indictment makes repeated reference to a "Hedge Fund A" which participated in the scheme, and which surreptitiously kicked back payments to Left through a third-party intermediary referred to as "Individual F," to conceal Hedge Fund A's participation in the scheme. On information and belief, "Hedge Fund A" is Anson, and "Individual F" is Feshbach.

112.   The indictment also makes repeated reference to an "Individual A" who participated in the criminal scheme, who the government alleges "was the minority partner in

Citron Capital . . . [and who] executed trades at the direction of Left. On information and belief, "Individual A" is Choi.

113. PolarityTE was expressly identified in the indictment as of the companies targeted by the scheme, through the attacks described above.

114. On the same day, the SEC filed an enforcement action against Left and Citron Capital LLC, for engaging in the same scheme described above against 23 companies. The complaint alleges that Citron and Left gained $20 million of illicit profits through the scheme, and it charges them with violating Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

115. On October 22, 2024, the SEC filed a settled enforcement action against Choi (C.D. Cal. Case No. 2:24-cv-09082), in connection with Choi's role in part of the scheme detailed above. The SEC complaint against Choi expressly alleges that "Choi entered the trades in the Citron Capital account" – the same language used to describe the conduct of "Individual A" in the indictment, leading Plaintiffs to conclude that Choi is "Individual A." Choi agreed to the entry of a final judgment permanently enjoining him from violating Section 17(a)(3) of the Securities Act and requiring him to pay a civil penalty of $115,231, disgorgement of $1,647,217, and prejudgment interest of $64,818.

116. Shortly before the SEC sued Choi, Citron and Left, and the DOJ indicted Left, the SEC brought a related enforcement action against Anson Advisors and Anson Funds. In a settled action announced on June 11, 2024, the SEC charged Anson for making "misleading disclosures regarding [its] work with activist short publishers." The charges expressly noted that Anson hid the fact that "from at least 2018 through 2023" it worked with and surreptitiously paid 'Short Publisher A' (described as "an activist short publisher that presents itself to the market as an

-24-

independent research firm) and 'Individual A' (described as the person who "founded Short Publisher A around 2008 and has been writing and disseminating reports and tweets through that platform since its inception"). On information and belief, the complaint is describing Citron and Left.

117.    The SEC found that Anson Advisors willfully violated Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder, and Anson Funds willfully violated Sections 204 and 206(4) of the Advisers Act and Rules 204-2, 206(4)-7, and 206(4)-8 thereunder. Advisors and Anson Funds have agreed to a cease-and-desist order and a censure. Anson Advisors agreed to pay civil money penalties of $1,000,000, and Anson Funds agreed to pay civil money penalties of $1,250,000.

118.    The enforcement actions against Choi, Citron and Anson were mere "slaps on the wrist;" Plaintiffs believe that the government did not indict those parties because they are cooperating in the government's criminal case against Left.

### DISCOVERY RULE

119.    Defendants are estopped from asserting the affirmative defense of limitations in this action, as the Defendants' misconduct which gave rise to these claims was not discovered by Plaintiffs or discoverable by Plaintiffs until, at the earliest, July 2024, when the U.S. Department of Justice indicted Left in an action styled as *United States of America v. Andrew Left*, U.S.D.C. for the Central District of California ("C.D. Cal.") case no. 2:24-cr-00456-TJH, and the Securities Exchange Commission commenced an enforcement action styled as *Securities Exchange Commission v. Andrew Left, et al.*, U.S.D.C. C.D.Cal. case no. 2:24-cv-06311, which complaints filed in both actions revealed to the public for the first time the details of the scheme alleged herein. Due to this, Plaintiffs could not have discovered or exercised reasonable diligence to identify the

basis for their claims until July 26, 2024 at the earliest. This action was filed within the statute of limitations for filing each and every one of the causes of action.

## COMPLIANCE WITH TEXAS DEFAMATION MITIGATION ACT

120.    In compliance with Texas Civil Practice & Remedies Code section 73.055, Plaintiffs have served a request for correction, clarification, or retraction (1) on Defendants, (2) that was made in writing, reasonably identified that Plaintiffs were making the request, and was signed by Plaintiffs or Plaintiffs' authorized agent; (3) that stated with particularity the statement alleged to be false and defamatory and, to the extent known, the time and place of publication; (4) that alleged the defamatory meaning of the statement; and (5) that specified the circumstances causing a defamatory meaning of the statement, to the extent that meaning arose from something other than the express language of the publication.

## FIRST CAUSE OF ACTION – BUSINESS DISPARAGEMENT

121.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

122.    Defendants made false and disparaging statements about PolarityTE's and Plaintiffs' business which were republished by Left as alleged herein.

123.    The statements were disparaging to PolarityTE because, among other reasons, the statements accused PolarityTE of being a fraud and accused company management of criminal conduct. The statements about Plaintiff Honig were disparaging because, among other reasons, they falsely accused him of being a "stock promoter" for "failed companies."

124.    Defendants published the false and disparaging statements with knowledge that they were false or with no reasonable grounds for believing them to be true.

125.    Defendants made these false statements maliciously and/or recklessly, and Defendants had no right, privilege, or justification to make the statements.

126.    As a direct and proximate result of the above-described conduct by Defendants, Plaintiffs suffered general and special damages in an amount in excess of the jurisdictional minimum of this court, including damage to Plaintiffs' reputation and money damages.

127.    Defendants are liable for damage for the publication of these false statements by third parties because Defendants knew and intended that third parties would communicate the false statements to investors, analysts and to the investing public at-large.

128.    Defendants statements were made intentionally or with a conscious disregard of the truth and with an intent to injure PolarityTE and Plaintiffs, such as to constitute oppression, fraud or malice, thus entitling Plaintiffs to exemplary and punitive damages in an amount appropriate to punish or set an example of Defendnats and to deter such conduct in the future, at an amount that will be proved at trial.

## SECOND CAUSE OF ACTION – TORTIOUS INTERFERENCE

129.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

130.    Plaintiffs had a number of contracts with PolarityTE in connection with the company's issuance to them of preferred convertible shares. The existence of these contracts was publicly disclosed by PolarityTE in its filings with the SEC.

131.    On information and belief, Defendants knew of these contracts.

132.    Defendants intentionally interfered with these contracts by improperly publishing false, negative information about PolarityTE, which affected the market price of PolarityTE stock,

and in turn, the formula by which Plaintiffs could convert their preferred shares into common shares.

133.    Defendants have no justification for this interference.

134.    As a result of Defendants' conduct, Plaintiffs sustained damages in an amount in excess of the minimum jurisdictional limits of this Court, and seek judgment against Defendants for their actual damages, plus interest at the maximum legal rate, and costs associated with this lawsuit pursuant to applicable law.

### THIRD CAUSE OF ACTION – NEGLIGENCE

135.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

136.    Defendants owed a legal duty to PolarityTE and Plaintiffs.

137.    Defendants breached their duty by secretly coordinating with a third-party to publish false negative news about the targets via online social media and traditional news media, appearances on cable news programs, interviews, and mainstream news articles. The negative news coordinated via each attack was designed to cause the market price of PolarityTE to rapidly decline, at which point Defendants covered their short positions. Plaintiffs believe that discovery will reveal other persons with whom Defendants coordinated their attack on PolarityTE.

138.    Defendants' breaches of their duty proximately caused injury to the Plaintiffs resulting in business damages including but not limited to: (i) the sale of some of Plaintiffs' shares in PolarityTE at very depressed prices affected by Defendants' scheme; and (ii) Plaintiffs inability to sell the remainder of their shares prior to PolarityTE's bankruptcy which was caused by Defendants.

**FOURTH CAUSE OF ACTION – GROSS NEGLIGENCE**

139.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

140.    Defendants owed a legal duty not to PolarityTE and Plaintiffs.

141.    Defendants breached that duty by secretly coordinating with a third-party to publish false negative news about the targets via online social media and traditional news media, appearances on cable news programs, interviews, and mainstream news articles. The negative news coordinated via each attack was designed to cause the market price of PolarityTE to rapidly decline, at which point Defendants covered their short positions. Plaintiffs believe that discovery will reveal other persons with whom Defendants coordinated their attack on PolarityTE.

142.    Defendants' conduct created an extreme degree of risk of financial harm to Plaintiffs, and Defendants had actual, subjective awareness of that risk.

143.    Despite this awareness, Defendants proceeded with conscious indifference to the rights and financial interests of Plaintiffs.

144.    Defendants' conduct therefore constitutes gross negligence under Texas law. Plaintiffs seek recovery of their actual damages, together with exemplary damages in an amount to be determined by the trier of fact.

**FIFTH CAUSE OF ACTION – CONSPIRACY**

145.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

146.    Each of Defendants entered into a conspiracy with each of the other Defendants and others as alleged herein to (i) disparage PolarityTE's and Plaintiffs' business and (ii) tortiously

interfere with PolarityTE's and Plaintiffs' contracts, and thereby harming Plaintiffs profiting from their short positions in PolarityTE securities' significant discount.

147. In furtherance of their conspiracy, Defendants and their co-conspirators took the actions described herein.

148. Plaintiffs were damaged in an amount subject to proof as a direct and proximate result of the civil conspiracy. Defendants are jointly and severally liable for all such injuries sustained by Plaintiffs.

## VICARIOUS LIABILITY

149. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

150. At all relevant times, Defendants Moez Kassam and Sunny Puri were Co-Founder, Chairman and Chief Investment Officer of Anson and Co-Head of Investments of Anson. The conduct of Messrs. Kassam and Puri, described above, occurred in the course and scope of Anson's business.  As such, Anson is liable for the actions and conduct of Messrs. Kassam and Puri under the doctrines of vicarious liability and respondeat superior.

151. At all relevant times, Defendant Ryan Choi was a manager of Citron Capital, LLC and Citron Capital, LP.  The conduct of Mr. Choi described above, occurred in the course and scope of Citron Capital, LLC and Citron Capital, LP's business.  As such, Citron Capital, LLC and Citron Capital, LP are liable for the actions and conduct of Mr. Choi under the doctrines of vicarious liability and respondeat superior.

## DEMAND FOR JURY

152. Plaintiffs hereby demand a trial by jury for all issues so triable and pay the jury fee.

**<u>PRAYER</u>**

WHEREFORE, premises considered, Barry C. Honig, GRQ Consultants, Inc., and the Renee Honig Family Foundation, Plaintiffs herein, pray that a judgment be entered against Defendants as follows:

1. General, special actual, economic, reputational and consequential damages;

2. Punitive and/or exemplary damages;

3. Prejudgment and post judgment interest;

4. Court costs and fees; and

5. All other relief to which Plaintiffs are entitled.

Plaintiffs' Original Complaint

Dated:  April 10, 2026

Respectfully submitted,

SHEPPARD MULLIN RICHTER & HAMPTON LLP


By      /s/  *Constantine Z. Pamphilis*
Constantine Z. Pamphilis
State Bar No. 00794419
dpamphilis@sheppard.com
845 Texas Avenue, 25th Floor
Houston, Texas  77002
Tel. (713) 431-7100
Fax (713) 431-7101

Robert D. Weber (*pro hac vice* application forthcoming)
rweber@sheppard.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California, 90067
Tel. (310) 228-3700
Fax (310) 228-3701

Christina C. Koenig
State Bar No. 24125177
ckoenig@sheppard.com
2200 Ross Avenue, 20th Floor
Dallas, Texas 75201
Tel. (469) 391-7432
Fax (469) 391-7401


ATTORNEYS FOR PLAINTIFFS